| | | |
|---|---|---|
| CHRISTOPHER MOLNAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:07-CV-241-TS |
| | ) | |
| MITTAL STEEL USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| MITTAL STEEL USA, INC., a/k/a | ) | |
| ARCELOR MITTAL STEEL USA, INC., | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEKRON CONSULTING, INC., f/k/a | ) | |
| KETER CONSULTANTS, INC., and | ) | |
| KETER ENVIRONMENTAL | ) | |
| CONSULTANTS, INC., and HARTORD | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 37], filed by

Third-Party Defendant Pekron Consulting, Inc. Also pending before the Court are Third-Party

Plaintiff Mittal Steel's Motion for Leave to File Supplemental Response to Summary Judgment

[DE 45], Pekron's Motion to Strike Two Exhibits to Arcelor Mittal's Response to Summary

Judgment [DE 49], and motions for a hearing on the Motion for Summary Judgment [DE 48] and

on the Motion for Leave to File Supplemental Response [DE 52]. Discovery issues are set forth

in a Motion to Compel [DE 56], filed by Mittal Steel, and a Motion to Reconsider the Court's

Determination that Mittal's Response to Motion for Summary Judgment Was Not Timely Filed

and Denial of Additional Time to Complete Discovery and Respond to Summary Judgment [DE 58], also filed by Mittal Steel.

## BACKGROUND

The Plaintiff, Christopher Molnar, filed a personal injury suit against Defendant Mittal Steel, alleging that on July 6, 2005, he was working at the Arcelor Mittal facility in East Chicago, Indiana, when the floor beneath him gave way and caused him to fall twenty-four feet. Molnar alleges that he was an invitee of Arcelor Mittal at the time of the accident, and that Mittal's carelessness and negligence caused his injuries. Molnar's Complaint does not assert any allegations of negligence against Pekron Consulting.

Mittal Steel filed an Answer to Molnar's Complaint and filed a Third-Party Complaint against Pekron Consulting and Hartford Insurance Company. Mittal Steel alleges that, at the time of Molnar's accident on its premises, Molnar was an employee of Pekron. Mittal Steel asserts that the work performed by Pekron for Mittal Steel was controlled by Purchase Order No. 1-R-2200, which obligated Pekron to indemnify Mittal Steel for losses caused by negligence. Purchase Order No. 1-R-2200 is attached as Exhibit A to Mittal's Third-Party Complaint. Mittal Steel also alleges that a policy of liability insurance issued by Hartford naming Mittal Steel as an additional insured for general liability insurance was in effect at the time of Molnar's fall. Mittal Steel claims that Pekron breached its contractual obligation to indemnify and defend Mittal Steel, and that Pekron is estopped from claiming that it does not owe Mittal Steel attorney fees, a defense to the complaint, and coverage under the policy of insurance. Mittal Steel makes similar claims against Hartford, claiming that Hartford failed to provide coverage under its policy of

insurance and that it is estopped from claiming that it does not owe Mittal Steel attorney fees, a defense to Molnar's complaint, and coverage under its policy.

Pekron answered the Third-Party Complaint, alleged affirmative defenses, and asserted a Counterclaim for Declaratory Judgment. In its Counterclaim, Pekron seeks a declaration that it does not owe a duty to defend or to indemnify Mittal Steel in regard to the claims that arise out of Molnar's incident of July 6, 2005.

On February 23, 2009, Pekron Consulting moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Pekron argues that the terms of purchase order 1-R-2200 do not require Pekron to idemnify or defend Mittal under the circumstances of Molnar's case, which only alleges negligence on the part of Mittal Steel. Pekron also argues that the terms of the purchase order are unenforceable as an indefinite quantities contract. In response to Mittal Steel's estoppel claim, Pekron argues that the elements of estoppel are absent from this case because Pekron never promised to indemnify or defend Mittal for its own negligence or to provide it with insurance.

On March 30, Mittal Steel responded to Pekron's Motion for Summary Judgment, designating as evidence Purchase Order 1-R-2200 and two certificates of liability insurance that it contends are proof that Pekron contracted to provide liability insurance to Mittal Steel. On April 1, Mittal Steel filed a Verified Motion for Leave to Supplement Response to Summary Judgment. In this Motion, Mittal recounts its diligence in searching for documents, a search it contends was hindered by the reorganization and change in its ownership from ISPAT-Inland, Inc., to Mittal Steel USA, Inc., and subsequently to Arcelor Mittal Steel USA, Inc. Mittal Steel submits that on March 31 it located Pekron invoices that had been submitted to Mittal Steel

pursuant to Purchase Order 1-R-2200. Mittal Steel submits that the "invoices certainly set forth parameters relevant to the control and conduct of the work, provided under the Purchase Order and, in fact, specifically reference the Purchase Order, by number, 1-R-2200." (Verified Motion 4, DE 45.) The Motion for Leave to Supplement also identifies releases of purchase orders that Mittal Steel issued to Pekron pursuant to Pekron's invoice numbers. Mittal Steel submits that language included in the releases is evidence that additional "General Purchasing Conditions for Purchase of Goods or Services" (General Purchasing Conditions or GPC) governed the contractual relationship between Pekron and Mittal Steel. Importantly, the General Purchasing Conditions contain broader indemnity provisions and insurance requirements than those contained in Purchase Order 1-R-2200.

Pekron objects to the Motion for Leave to Supplement as an improper attempt to amend the Third-Party Complaint. Pekron argues that because 1-R-2200, not the General Purchasing Conditions, formed the basis of the Third-Party Complaint, it has no bearing on the pending motion for summary judgment, and Mittal Steel is improperly attempting to alter the theory and documentation upon which it bases its Third Party Complaint. Pekron submits that the time to amend pleadings has passed, and that a plaintiff may not amend his complaint through arguments in his brief in opposition to summary judgment. Pekron also notes that the General Purchasing Conditions document that is attached to the Motion is dated February 2007, but that Molnar's accident occurred on July 6, 2005. Pekron argues that "Mittal makes no effort whatsoever to explain to this Court how a document that was not created until 2007 would have been binding on Pekron in 2005 at the time of the work performed or at the time the initial Purchase Order was issued in 2001." (Pekron's Resp. 3, DE 47.) As a third reason to deny the Motion, Pekron argues

that Mittal Steel was not diligent in its efforts to secure the new evidence.

In reply, Mittal Steel argues that the General Purchasing Conditions, like Purchase Order 1-R-2200, relates to the "purchase transaction of specific services relevant to issues before the court." (Reply 1–2, DE 51.) Mittal notes that a release was issued for each invoice, suggesting that the initial Purchase Order did not stand alone. Mittal urges that whether the various documents create a single contract or multiple contracts must be considered, and creates genuine issues of triable fact. Mittal also points to its diligence in attempting to locate and retrieve relevant documents, and to the judicial preference that cases be decided on their merits.

In addition to disputing the relevance and admissibility of Mittal Steel's requested supplemental evidence, Pekron moves to strike two of the exhibits Mittal Steel provided in response to summary judgment. (Pekron's Motion to Strike Two Exhibits to Arcelor Mittal's Response to Summary Judgment, DE 49.) Pekron argues that the two certificates of insurance (designated by Mittal as Exhibits B and C), have not been authenticated by any means and are thus not admissible pursuant to Federal Rules of Evidence 901 and 902. Further, Pekron argues that Exhibit C is not relevant because it is dated more than five months after Molnar's accident.

Additional briefs before the Court related to the above issues include Pekron's Reply in Support of its Motion for Summary Judgment; Mittal Steel's Reply in Support of its Motion for Leave to Supplement its Response to Summary Judgment; Mittal Steel's Response to Motion to Strike; and Pekron's Reply in Support of its Motion to Strike. Pekron has requested oral argument on its Motion for Summary Judgment [DE 48], and Mittal has requested a hearing on its Motion for Leave to Supplement [DE 52].

This case also has unresolved discovery issues with potential bearing on the Motion for

Summary Judgment. In the midst of the briefing and motions related to summary judgment, Mittal Steel moved to extend the discovery deadline and for an extension of time to respond to the Motion for Summary Judgment. Mittal complained that Pekron's refusal to respond to its request for production of documents necessitated the requested extensions. On May 7, 2009, the magistrate judge denied the motion to extend fact discovery without prejudice because Mittal Steel had not demonstrated good cause for altering the discovery deadlines. The court reasoned that Mittal served its last request for production on Pekron less than thirty days before the end of the fact discovery deadline, and thus did not demonstrate sufficient diligence in meeting the established discovery deadlines. The magistrate judge also noted that any dispute related to the content of Pekron's responses to Mittal's discovery requests had to be addressed in a separate motion, which did not require an extension of the discovery deadline. The magistrate judge also denied without prejudice the motion for extension of time to respond to Pekron's Motion for Summary Judgment. The court stated that a motion to extend time to respond was not the proper way to address any lack of discovery that was necessary to respond, and cited to Federal Rule of Civil Procedure 56(f). Regarding Mittal's contention that it had already filed a timely response, the court disagreed, stating that its response, filed on March 30, 2009, was five days beyond the time to respond set forth in the Local Rules. The court granted Mittal Steel ten days to show the court, with the proper application of Rule 56(f) or a proper discovery motion, why its requests for extensions should be granted.

In response to the Magistrate Judge's May 7 Order, Mittal Steel filed a Motion to Compel [DE 56] and Memorandum in Support [DE 57]. It also filed a Motion to Reconsider the Court's Determination that Mittal's Response to Motion for Summary Judgment Was Not Timely Filed

and Denial of Additional Time to Complete Discovery and Respond to Summary Judgment [DE 58]. In this Motion, Mittal Steel explained that, in light of Local Rule 7.1 and Federal Rules of Civil Procedure 6(e) and 6(a)(3), its Response to Motion for Summary Judgment was not untimely.[1] Mittal Steel requested that the court reconsider its Opinion and Order of May 7, taking into consideration its timely response, as well as the reasons set forth in its Motion for Extension of Time, Motion for Leave to Supplement Response, and Motion to Compel. Pekron filed a response to the Motion for Reconsideration arguing that the timeliness of Mittal Steel's response to it Motion for Summary Judgment was peripheral to the substance of the May 7 order, which otherwise correctly denied the motion to extend discovery for lack of diligence by Mittal. Pekron also noted that Mittal Steel had at no time sought relief pursuant to Rule 56(f). Pekron asserted that the Motion to Compel did not warrant a different outcome because Mittal Steel did not diligently search its own records for the information it claims it needed to respond to Pekron's Motion for Summary Judgment. Pekron also asserts that it has produced all documents responsive to Mittal's requests.

On June 9, Mittal Steel filed its Reply in Support of Its Motion to Compel and Motion to Reconsider. Mittal argues that Pekron has failed to supplement its discovery pursuant to Rule 26(e), that Pekron's interpretation of documents does not control whether they are responsive to discovery requests, and that Pekron is required to provide a privilege log for discovery that it has failed to produce on claims of privilege.

---

[1] It appears that Mittal's response was timely filed.

# SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party

as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). The court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).


## STATEMENT OF FACTS

Christopher Molnar has sued Mittal Steel for injuries he sustained while working at the Mittal Steel facility in East Chicago, Indiana, on July 6, 2005. He alleges that he was on the premises as an invitee when a floor made of three foot square solid metal gave way and caused him to fall about twenty-four feet. The Plaintiff asserts that the condition of the flooring caused a dangerous and defective condition upon Mittal Steel's property, and that Mittal Steel carelessly and negligently (1) failed to post appropriate warnings, (2) allowed dangerous conditions to occur, and (3) failed to provide a safety inspection to ensure a safe place to work.

The Plaintiff was an employee of Pekron when he fell and sustained the injuries that form

the basis of his Complaint. In its Third-Party Complaint against Pekron, Mittal Steel alleges that work performed by Pekron employees was controlled by Purchase Order No. 1-R-2200. In paragraph 9 of the "Conditions of Purchase," the Order provides the following regarding indemnity:

> Seller shall defend, indemnify and save harmless Purchaser and any of its affiliates from and against, and reimburse them for, any loss, damage, liability, cost or expense (including reasonable attorney's fees and legal expenses) relating to the death or injury to any person whomsoever (including any property of the Purchaser or any of its affiliates) arising directly or indirectly from or in connection with any defect in or any breach of warranty with respect to goods covered by this order or from or in connection with any work performed or to be performed hereunder. Seller further agrees to release, and does hereby release, Purchaser and its affiliates from and does hereby waive any right to claim or ask for any damages or reimbursement for or on account of any loss or damage to any property of Seller arising directly or indirectly from or in connection with any work performed or to be performed hereunder.

(DE 19-2, p. 2.)[2] Relying on this indemnity language from Purchase Order 1-R-2200, Mittal Steel wrote Pekron (at the time Keter Consultants) to tender defense of Molnar's action.

Mittal Steel also alleges that at the time Molnar brought his action, Hartford had issued a policy of liability insurance that named Mittal Steel as an additional insured for general liability coverage. Mittal Steel asked Pekron to forward its letter to tender a defense to Hartford, but neither Pekron nor Hartford have appeared to defend or to indemnify Mittal Steel.

## DISCUSSION

Because the indemnity and insurance provisions set forth in the General Purchasing Conditions attached to the Motion to Supplement impose different obligations than those set

---

[2] The contract contained a second indemnity paragraph regarding infringement of patents, which is not relevant to the issues before the Court.

forth in Purchase Order 1-R-2200, the Court will limit its analysis to the Plaintiff's claims as they are alleged in Mittal's Third-Party Complaint, and defended in Pekron's Motion for Summary Judgment. The Court will then consider whether to allow Mittal to supplement its response to Pekron's Motion for Summary Judgment.

**A.      Purchase Order 1-R-2200**

**1.      *Breach of Contract—Refusal to Indemnify or Defend***

In an indemnity agreement one party (the indemnitor) promises to reimburse another party (the indemnitee) for the indemnitee's loss, damage, or liability, thereby shifting the financial obligation to pay damages from the indemnitee to the indemnitor. *Mead Johnson & Co., Inc. v. Kenco Group, Inc.*, 899 N.E.2d 1, 3 (Ind. Ct. App. 2009); *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 756 (Ind. Ct. App. 2002); *Ozinga Transp. Sys., Inc. v. Mich. Ash Sales, Inc.*, 676 N.E.2d 379, 386 (Ind. Ct. App. 1997). If the words of the indemnity clause are clear and unambiguous, they are to be given their plain and ordinary meaning, and indemnity agreements are construed "to cover all losses and damages to which it reasonably appears the parties intended it to apply." *Mead Johnson*, 899 N.E.2d at 3 (quoting *Zebrowski & Assocs., Inc. v. City of Indianapolis*, 457 N.E.2d 259, 261 (Ind. Ct. App. 1983)).

Because a contract that obligates one party to pay for the negligence of the other party is a "harsh burden," the terms must be clear and unequivocal, defining not only "the area of application, that is, negligence, but also defin[ing] the cause of damages in terms of physical or legal responsibility, that is, to whom the clause applies." *Moore Heating and Plumbing, Inc. v. Huber, Hunt & Nichols*, 583 N.E. 2d 142, 145 (Ind. Ct. App. 1991).

For example, if a clause simply states that a subcontractor shall indemnify a general contractor for any negligence which arises from the job, it is sufficient to show that the clause applies to negligence but is insufficient to inform the subcontractor that it must indemnify the general contractor for acts of the general contractor's own negligence. The claim of negligence which arises from the job could have been caused by the negligence of the general contractor, the subcontractor, third persons, or a combination of them. This is the very reason the indemnity for the indemnitee's own negligence must be specifically, not generally, prescribed. Therefore, in order to reflect a knowing and willing acceptance of such a harsh burden, the indemnification clause must expressly state, in clear and unequivocal terms, that the indemnitee agrees to indemnify the indemnitor against the indemnitor's own negligence.

*Id.*, 583 N.E.2d at 145–46.

The parties do not dispute that the indemnity clause in Purchase Order 1-R2200, which refers to "loss, damage, liability, cost or expense" relating to "death or injury," adequately defines negligence as an area of application. *See, e.g., Hagerman Constr. Co. v. Long Elec. Co.*, 741 N.E.2d 390, 393 (Ind. Ct. App. 2000) (holding that an indemnification clause clearly and unequivocally applied to negligence because the clause spoke of claims, damages, losses and expenses attributable to bodily injury, sickness, disease or death and injury to or destruction of property). Pekron submits, however, that because it never agreed in clear and unequivocal terms to indemnify Mittal for its own negligence, summary judgment is appropriate. Pekron points to *Exide Corporation v. Millwright Riggers, Inc.*, 727 N.E.2d 473 (Ind. Ct. App. 2000), as governing this result. In *Exide*, a construction worker brought an action against the operator of the factory in which he was working after he fell twenty feet through an improperly secured grating on a catwalk. The operator, Exide, brought a third-party indemnification claim against the worker's employer, which had been hired to renovate and repair parts of the factory.[3] The

---

[3] The *Exide* case actually involved two separate incidents. The second involved a worker who was at the Exide factory to repair a hoist system and fell into an opening in the top of a vat of molten lead. He sued Exide, and Exide answered the complaint and filed a third-party complaint against the contractor,

indemnification provision at issue provided:

> Without limiting the foregoing, Contractor, for itself, its successors and assigns releases Exide and agrees to indemnify, defend with counsel satisfactory to Exide and hold harmless Exide and its officers and employees from any [sic] against any and all liability, claims, actions, suits, losses, costs and expenses (including without limitation attorneys' fees), fines or penalties which may arise in any way, directly or indirectly, from Contractor, its employees, subcontractors and their employees, third persons or the government, and from entry onto the Site or any other Exide property or from use, the possession, handling, storage, transportation, and treatment or disposal, of any materials or exposure thereto or contract therewith. This indemnity shall survive the termination or expiration of any contract between the contractor and Exide or receipt and removal of the materials. If any portion of this indemnity shall in the future be deemed or held to be invalid or unenforceable, the indemnity shall apply and be enforceable to the maximum extent allowed by law.

*Exide*, 727 N.E.2d at 479. The court held that, although the contract language sufficiently stated that it applied to negligence, it was not sufficient to inform the subcontractor that it must indemnify the general contractor for acts of the general contractor's own negligence. *Id.* at 479–80. Because Exide was seeking indemnification for its own negligence, and the clause did not explicitly apply to Exide's own negligent acts, the contract was unenforceable. *Id.*

Mittal's position is that Purchase Order 1-R-2200, like the one in *Exide*, "contains no clear statement that would give [Pekron] notice of the harsh burden that complete indemnification imposes." *Exide*, 727 N.E.2d at 480. That is, there is no language to alert Pekron that it had agreed to indemnify Mittal Steel even when Mittal Steel was the at-fault party. This Court agrees. The indemnity provision in 1-R-2200 does not expressly state, in clear and unequivocal terms, that Pekron agreed to indemnify Mittal Steel against losses, damages, liability, or costs arising out of Mittal Steel's own negligence.

---

claiming that it was contractually obligated to indemnify Exide, pay its attorneys' fees, and provide Exide with insurance. 727 N.E.2d at 477.

In its response, Mittal Steel does not specifically refute this or argue a different interpretation of the contract. Instead, Mittal attempts to characterize the lawsuit in such a way that fits it within the indemnity language of 1-R-2200. Mittal argues that a "contract was formed for Pekron to indemnify Mittal in the event of a claim for negligence. And if not to indemnify Mittal for its own negligence, it certainly required Pekron to indemnify Mittal to the extent Mittal defends against negligence and argues that it is not negligent, which is exactly what Mittal asserted in its Second Amended Answer, Third Party Complaint." (Mittal's Resp. 7–8, DE 44; Second Amended Answer to Complaint for Damages, Jury Demand and Third-Party Complaint at 2–3, 4, DE 19) (asserting that it was not at fault and that Molnar and non-parties, including Pekron, are at fault).) Mittal Steel submits that liability issues on Molnar's underlying claim, including whether Mittal Steel is at fault, are for a trier of fact to decide and preclude summary judgment on its breach of contract claim. It argues that if it is not at fault, the failure of Pekron to defend and indemnify it will have breached the contractual language requiring Pekron to "defend, indemnify and save harmless" Mittal Steel "from and against, and reimburse them for, any loss, damage, liability, cost or expense (including reasonable attorney's fees and legal expenses) relating to the . . . injury to any person whomsoever . . . arising directly or indirectly . . . from or in connection with any work performed or to be performed" under their contract. (Purchase Order, ¶ 9.) Pekron counters that Molnar's suit is against Mittal to recover for Mittal's own negligence and his Complaint makes no allegation of negligence against Pekron. It argues that Molnar will not receive any recovery from Mittal Steel unless Mittal Steel is found to be negligent, and that under Indiana's Comparative Fault Act, Mittal Steel could never be responsible for Pekron's negligence, but only for its own. Regarding Pekron's duty to defend,

Pekron asserts that even if Mittal is found not negligent in Molnar's suit, Mittal Steel will have defended Molnar's claim "based entirely on allegations of its own negligence." (Pekron's Reply 5.)

The negligence Molnar asserts in his Complaint is that of Mittal Steel, and Mittal Steel alone. Thus, it is not covered by the indemnity agreement contained in Purchase Order 1-R-2200. Mittal cannot alter the nature of Molnar's claim through its denials and defenses, and thereby fit it into the indemnity clause. That liability could possibly be apportioned differently, or Mittal found not to be liable at all, only highlights the fact that, even if an obligation to indemnify exists, it has not yet been breached as "[t]he obligation to indemnify does not arise until the party seeking indemnity suffers loss or incurs damages. This may occur when the party seeking indemnity 1) pays the underlying claim; 2) pays judgment on the underlying claim; or 3) tenders payment in settlement of the underlying claim." *Essex Group, Inc. v. Nill*, 594 N.E.2d 503, 507 (Ind. Ct. App. 1992); *see also Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 758 (Ind. Ct. App. 2002) (holding that a promise to indemnify against "liability, loss, cost or expenses" was not triggered because the party seeking indemnity had not paid the underlying claim or demonstrated that its liability had become fixed). Mittal has done none of these actions to trigger any obligation for indemnity.

Mittal's argument that Pekron had a duty to defend it, which is separate and independent from the duty to indemnify, *see Henthorne*, 764 N.E.2d at 757, fares no better. Under Indiana law, a court determines a duty to defend from the allegations contained within the complaint and from those facts known or ascertainable after reasonable investigation. *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003) (citation

omitted). Therefore, "[i]f the pleadings reveal that a claim is clearly excluded under the policy, then no defense is required." *Id.* (citation omitted). Additionally, a party "may go beyond the face of the complaint and refuse to defend based upon the factual underpinnings of the claims contained within the complaint." *Id.* (citing *Cincinnati Ins. Co. v. Mallon*, 409 N.E.2d 1100, 1105 (Ind. Ct. App. 1980). "Accordingly, it is the nature of the claim, not its merits, that determines [a party's] duty to defend." *Jim Barna Log Sys. Midwest, Inc.*, 791 N.E.2d at 823.

    *United Consulting Engineers v. Bd. of Com'rs of Hancock County*, 810 N.E.2d 351, (Ind. Ct. App. 2004) is instructive. In *United Consulting*, the county hired an engineering firm (UCE) to provide consulting services in connection with the replacement of a bridge. The estate of a motorist who was killed while driving through the construction site sued the county, UCE, and others for negligence. The county filed a cross-claim against UCE, claiming that it breached its duty to defend, indemnify, and purchase insurance for the county. The court determined that the indemnity provision required UCE to be responsible for all damages arising from services it rendered and required UCE to defend the county from damages arising from UCE's negligence alone. The court stated that "nothing in [the indemnity paragraph] or in any other part within the four corners of the contract indicates that UCE is responsible for defending the County against its own negligence." 810 N.E.2d at 354.

    Here, the underlying negligence suit does not allege any action that is potentially covered by paragraph 19 of Purchase Order 1-R-2200 because Pekron did not specifically agree to indemnify or defend Mittal Steel for recoveries obtained as a result of its own acts of negligence. The allegations in Molnar's Complaint cannot result in a judgment that Pekron would be obligated to pay. In defending Molnar's suit, Mittal Steel will only be required to defend against

its own negligence—which is outside the scope of the duty to defend that Pekron agreed to undertake.

Pekron's motion for summary judgment on Mittal's claim that Pekron breached a duty to indemnify and defend Mittal, as set forth in Purchase Order 1-R-2200, will be granted.

2.      *Breach of Contract—Failure to Pay Attorney's Fees*

Mittal Steel argues that Pekron's refusal to pay the costs of defending Molnar's lawsuit, including attorney's fees, constitutes a breach of the Purchase Order, and that it has suffered damages by having to hire its own counsel to defend the action. Mittal Steel submits that it is premature to grant summary judgment because, in the event that it is not liable, either in whole or in part, it is entitled to be indemnified for attorney's fees it incurred defending the negligence suit and prosecuting the third-party claim.

A similar argument was made, and rejected, in *Exide*. Exide asserted that even if it had no claim against the contractors for indemnification, they were still contractually obligated to pay the attorney's fees that Exide had incurred in the course of defending itself against the workers' claims. The court held that because the only provision regarding attorney's fees was located in the indemnification clause, and the indemnification clause was not enforceable because Exide was seeking indemnification from the contractors for its own negligence, Exide had no contractual right to attorney's fees. 727 N.E.2d at 481.

The same reasoning applies to Mittal Steel's claims for attorney's fees. Mittal Steel points to no obligation of Pekron to pay attorney's fees other than that located within the indemnity provision, which this Court has already determined does not apply to Molnar's claim

17

for damages due to Mittal Steel's negligence. Because Mittal Steel is seeking indemnification for its own acts of negligence, the indemnity clause is not applicable and does not bind Pekron to pay Mittal's attorney's fees. Mittal cites *Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163 (Ind. Ct. App. 1995), in support of its claim for attorney's fees. But the court's holding, that "[a]n indemnitee, who incurs legal expenses through defending an action against him *for which he is entitled to indemnification*, is entitled to recover the expenses of creating this defense, including reasonable attorney fees," 654 N.E.2d at 1169 (emphasis added), does not help Mittal Steel because it has not established that it is entitled to indemnification. Pekron is entitled to summary judgment on Mittal's claim that Pekron breached its contractual obligation to pay Mittal's attorney's fees.

3.      *Breach of Contract—Failure to Provide Insurance Coverage*

Mittal Steel maintains that Pekron contracted to provide insurance coverage. In support of its claim, Mittal Steel points to a certificate of insurance, attached to its Response as Exhibit C, which includes a typed sentence stating that Mittal Steel is "an additional insured insofar as the general liability coverage." Mittal Steel argues that Pekron sought insurance pursuant to an agreement to do so, and to secure the contract to work with Mittal. It continues, "This is the only rational inference, particularly when considered together with the 2003–2004 certification, attached as Exhibit 'B'. Certainly, Pekron did not unilaterally offer a gift of insurance to Mittal." (Resp. 14, DE 44.) Mittal argues that the pre-printed language on the certificate, indicating that it confers no rights under the policy, is superceded by the typewritten provision.

Pekron argues that Mittal has not identified any provision of 1-R-2200 or any other

document that required Pekron to buy Mittal liability insurance. Pekron asserts that Mittal is improperly attempting to use the certificate of insurance as parole or extraneous evidence, even though there is not ambiguity in the Purchase Order regarding Pekron's insurance obligations. Therefore, it argues, the Court should not consider the certificates.

When the terms of a contract are clear and unambiguous, those terms are conclusive, and the court will not construe the contract or look at extrinsic evidence but rather will simply apply the contract provisions. *Stout v. Kokomo Manor Apartments*, 677 N.E.2d 1060, 1064 (Ind. Ct. App. 1997). When interpreting a contract, a court must ascertain and effectuate the intent of the parties. *Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1290 (Ind. Ct. App. 2000). To succeed on its claim for breach of the obligation to procure insurance, Mittal Steel must show that Pekron was required to purchase insurance on its behalf. But Mittal Steel points to no agreement that specifically required Pekron to name it as a co-insured, additional insured, or joint insured on any of Pekron's insurance policies. Mittal Steel has not explained how 1-R-2200, or any other contract, is unclear or ambiguous regarding insurance coverage, such that extrinsic evidence should be considered. *See State v. Serowiecki*, 892 N.E.2d 194, 201 (Ind. Ct. App. 2008). To the extent that Mittal argues that the certificates of insurance are separate contracts (as opposed to parole evidence related to the Purchase Order), they do not create a triable issue of fact. They do not show that Pekron was obligated to provide Mittal with insurance as a prerequisite to doing business with Mittal. Mittal's argument that the reasonable inference is that Pekron must have provided insurance because it was obligated to is speculation, which cannot defeat a properly supported motion for summary judgment. *See Amadio v. Fort Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("[i]t is well-settled that speculation may not be used to manufacture a genuine issue

of fact."); *see also Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. A party must present more than mere speculation or conjecture to defeat a summary judgment motion." (internal citation omitted)). No reasonable fact finder could conclude on the basis of the evidence before the Court that Pekron had a duty to provide Mittal Steel with insurance coverage, and Pekron is entitled to judgment as a matter of law.[4]

### 4.      *Promissory Estoppel*

Mittal argues that Pekron is estopped from denying that it owes indemnity and insurance to Mittal because it promised to provide such, and Mittal already paid for indemnity and insurance, which was reflected in the parties' contract price. Mittal's estoppel claim with regard to indemnity relies on the language contained in Purchase Order 1-R-2200. Because the Court has already determined that Pekron did not agree to indemnify Mittal for its own negligence, Mittal cannot establish the elements of estoppel: "(1) a promise by the promisor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Kacak v. Bank Calumet, N.A.*, 869 N.E.2d 1239, 1242 (Ind. Ct. App. 2007). Likewise, there is no evidence that Pekron induced Mittal to substantially change its position by making a promise that it would provide general liability insurance coverage for Mittal Steel. *See id.* (stating that "a promisor who induces a substantial change of position by the

---

[4] Whether Third-Party Defendant Hartford Insurance breached any contractual obligations to Mittal is a separate and distinct issue that is not implicated by the Court's ruling with respect to Pekron.

promisee in reliance upon the promise is estopped from denying the enforceability of the promise" (brackets omitted).) There is no evidence that the cost of indemnifying or insuring Mittal was included in the contract price that Mittal paid to Pekron for its services. Accordingly, Pekron is entitled to summary judgment on Mittal's promissory estoppel claim.

**B.      General Purchasing Conditions for Purchase of Goods or Services—Motion For Leave to File Supplemental Response**

For the reasons already stated, unless Mittal Steel convinces the Court that it should be allowed to supplement its response to Pekron's Motion for Summary Judgment, Pekron will prevail in obtaining judgment as a matter of law.

Mittal Steel argues that it should be allowed to supplement its response to Pekron's Motion for Summary Judgment with "newly found documents." (DE 45.) These documents consist of invoices from Pekron (Keter Consultants) to Mittal's predecessor dated July 2005, which indicate that they are generated pursuant to Purchase Order 1-R-2200. A corresponding four-page "working copy" of a release generated by Mittal indicates at the bottom of the fourth page that "General Purchasing Conditions for Purchase of Goods or Services or Both Goods and Services, AMUSA-100" is available at Mittal Steel's website and that "'Purchase Order (AMUSA-100)' apply to this Order." (DE 45-2 at 7.)

Mittal Steel does not provide a copy of Purchase Order *AMUSA*-100 with its Motion or with any of its filings with the Court. The General Purchasing Conditions that Mittal Steel attaches to its Motion to Supplement is identified as "MUSA-100 (February Rev. 3) for Purchase Orders." (DE 45-2 at 8.) The bottom of each page of MUSA-100 includes a footer than indicates it was revised February 2007. The first paragraph, Scope of Application, states that the General

Purchasing Conditions (GPC) are "an integral part of any order ('Order') placed by the Buyer with Seller." (MUSA-100, ¶ 1.1.) However, subparagraph 1.4 provides, "Special provisions of an Order, specific terms agreed in writing with Seller, and any and all documents incorporated therein which may be in contradiction with these GPC, shall prevail over the corresponding GPC provisions." (MUSA-100, ¶ 1.4.)

MUSA-100 includes an indemnity provision that specifically requires the "Seller" to indemnify, defend and save harmless the "Buyer's Indemnitees" from any claim of negligence, "including without limitation concurrent, joint, comparative, active or passive negligent acts or omissions on the part of any of Buyer's Indemnitees or the condition of the job site or other property of any of Buyer's Indemnitees or otherwise." (MUSA-100 ¶ 12.3.) Paragraph 13 requires that the Buyer be covered as an additional insured on required policies of insurance for general liability, employers liability, and motor vehicle liability. (MUSA-100 ¶ 13.)

Mittal Steel argues that it should be allowed to make additional arguments in opposition to summary judgment that are based on the indemnity and insurance coverage provisions of MUSA-100. It contends that the releases, and these contractual provisions, "further the understanding of the initial Purchase Order suggesting that it did not stand alone." (DE 51 at 2.) Mittal continues with the following argument:

> As the Seventh Circuit has written, "[t]he characterization of a pair of documents as one contract or two cannot ordinarily be determined merely by gazing at them unless they say they are one contract or two . . . ." *Coplay Cement Co., Inc., v. Willis & Paul Group*, 983 F.2d 1435, 1438 (7th Cir. 1993). That is not the case here. Moreover, some of the information specific to the documents relevant to the transactions between Mittal and Pekron exists, at Mittal, in a database format. Effort are ongoing to clarify which portions of the database information relate to the Pekron/Mittal documents at issue. Thus, instruction from the *Coplay Cement* court is helpful. It counsels that "[w]hen the judicial task is to infer meaning from disparate bits of evidence, some textual, some testimonial, none contested in

themselves but the aggregate forming a confusing mosaic, it is a task more appropriate for a trier of fact than for a declarer of legal rules." *Id.* at 1439 (internal citations omitted). In other words, factual issues would weigh against summary judgment.

(Reply 2, DE 51.)[5]

The Court is not persuaded by Mittal's arguments. The very first paragraph of 1-R-2200 states on its face, in all capital letters, that it is one contract:

> THIS ORDER CONTAINS THE FINAL AND COMPLETE AGREEMENT BETWEEN PURCHASER AND SELLER AND NO OTHER AGREEMENT IN ANY WAY MODIFYING ANY OF ITS TERMS AND CONDITIONS WILL BE BINDING UPON PURCHASER UNLESS MADE IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF PURCHASER. ANY ADDITIONAL OF DIFFERENT TERMS IN SELLER'S TERMS ARE HEREBY DEEMED TO BE MATERIAL ALTERATIONS AND NOTICE OF OBJECTION TO THEM AND REJECTION OF THEM IS HEREBY GIVEN.

(Purchase Order 1-R-2200, ¶ 1, DE 19-1.) The newly discovered evidence that Mittal attaches to its Motion for Leave to File Supplemental Response does not include any writing that was signed by an authorized representative of Mittal and purported to modify the terms and conditions of 1-R-2200.

Even if 1-R-2200 did not encompass all of the agreements between Mittal Steel and Pekron, nothing has been presented to the Court to suggest that MUSA-100 is an additional documents that applied to Pekron's work at Mittal Steel. The bottom of the 2005 releases that reference Purchase Order 1-R-2200 state that Purchase Order AMUSA-100 (to be distinguished from MUSA-100) applied to the order. They make no reference to version MUSA-100, which indicates that it was revised in 2007. No copy of AMUSA-100, which is presumably in Mittal

---

[5] Presumably, Mittal Steel also intended this characterization of the new evidence to counter Pekron's argument that Mittal cannot amend its pleading through its response to a summary judgment motion. Mittal Steel has not sought to amend its Third-Party Complaint to include this additional contractual langage.

Steel's control, has been provided. Thus, there is nothing in the record to suggest that the indemnity and insurance provisions of MUSA-100 are the terms that Pekron agreed to and was operating under in 2005.

Further, even if MUSA-100 applied, it provides that special provisions of an Order and specific terms agreed to in writing with Mittal are to prevail if they contradict corresponding GPC provisions. Thus, according to the face of the two documents, the indemnity and insurance provisions of 1-R-2200, which contradict the GPC on the same subjects, would prevail. There is no need to consider extrinsic evidence and, although there may be disparate bits of evidence before the Court, Mittal Steel has not established that any of it requires inferences that are more suitable for a jury to make. Because Mittal Steel has not demonstrated that an additional response based on the documents provided with its Motion for Leave to Supplement Response to Summary Judgment would reasonably allow it to establish that Pekron agreed to indemnify and defend Mittal for Mittal's own negligence, or agreed to provide Mittal with insurance coverage as a price of doing business with it, its Motion will be denied.


**C.      Motion for Reconsideration Regarding Extension of Discovery Deadline and Motion to Compel**

Only the claims against Pekron are addressed in this Opinion and Order. Mittal Steel's claims against Third-Party Defendant Hartford Insurance Company remain pending. Mittal's request to extend the discovery deadline, which is the subject of its Motion for Reconsideration, was filed jointly with Hartford and objected to by Pekron. As Pekron is no longer a party to this suit, the Motion for Reconsideration will be denied as moot and without prejudice to the remaining parties ability to petition the Court for an extension of the discovery deadlines.

Likewise, with the dismissal of Pekron, the most efficient resolution of the Motion to Compel is to dismiss it without prejudice to Mittal asserting any discovery disputes that remain pertinent to the remaining claims against Hartford.

## CONCLUSION

For the foregoing reasons, Third-Party Defendant Pekron's Motion for Summary Judgment [DE 37] is GRANTED, Third-Party Plaintiff Mittal Steel's Motion for Leave to File Supplemental Response to Summary Judgment [DE 45] is DENIED, Pekron's Motion to Strike Two Exhibits to Arcelor Mittal's Response to Summary Judgment [DE 49] is DENIED as MOOT, Pekron's Request for Oral Argument Regarding its Motion for Summary Judgment [DE 48] is DENIED, Mittal Steel's Motion for Argument or Hearing on its Motion for Leave to File Supplemental Response [DE 52] is DENIED, Mittal's Steel's Motion to Compel [DE 56] is DENIED WITHOUT PREJUDICE, and Mittal Steel's Motion for Reconsideration [DE 58] is DENIED AS MOOT.

SO ORDERED on March 1, 2010.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION